JOHN G. FARNSWORTH, Receiver, etc., Respondent, *v.* THE WESTERN UNION TELEGRAPH CO., Appellant.

*Supreme Court, First Department, General Term, July 6, 1889.*

1. *Trespass.*—Possession of the property is sufficient, as against a wrong doer, to entitle a party to maintain an action of trespass.

2. *Same. Damages.*—Where the trespasser's conduct is wilful, suitable damages may be added to punish his misconduct.

3. *Same.*—Where the lessee of the American Rapid Telegraph Co., entered upon premises occupied by plaintiff, as receiver of the Bankers and Merchants' Telegraph Co., and cut wires of the latter company, then strung on the poles of the former company with its consent, the plaintiff is entitled to recover the damages sustained by the disturbance and interruption, and the consequent inability to proceed with the transaction of business.

4. *Former adjudication.*—The fact that an action, brought by the receiver involving the title to the wires, is pending, is not a defense to this action.

5. *Same. Defense.*—Nor is it any defense to this action that the purchaser, under the foreclosure sale in the other action might maintain an action to recover the same damages.

6. *Fixtures.*—Wires which are placed upon poles, with the intention that they should remain the property of the company putting them there, do not become part of the real estate, but retain their character as personal property.

7. *Evidence. Value.*—Evidence of the value of the Bankers and Merchants' Telegraph system, and of the amount for which the property was finally sold at the foreclosure sale, was incompetent on the question of damages.

8. *Same.*—Proof as to the value and income of defendant's property, is also incompetent.

9. *Order. Irregular.*—An irregular order, after vacation, affords no protection to the acts which may have been performed under it.

10. *Contracts. Statute of Frauds.*—An executory contract for stringing telegraph wires is within the statute of frauds; but so far as it has been performed by one, with the acquiescence of the other party, the statute will not annul the validity of that performance.

11. *Jurisdiction. Exclusive.*—Where an action has been properly commenced in one of the federal courts to determine the right to property, the jurisdiction of that court, undoubtedly, becomes from that time

exclusive, and it cannot be affected by an action afterwards brought or commenced in a court of one of the states.

12. *Same.*—But when the right and title to the property were not in any manner within the range of the complaint filed in the federal court, an action commenced subsequently in the state court, where the right and title to said property are brought within the allegations and scope of the complaint, gives the latter court the exclusive power and authority to determine the title and disposition which should be made of the property; and the court is not divested of this jurisdiction by a subsequent action in the United States Court, which was made to include the same property.

13. *Same.*—The exclusive jurisdiction of a court will form no defense to a subsequent action for the same subject matter, unless it is presented as such by the answer.

14. *Corporation.*—Where some irregularity existed in the proceedings of the executive committee of the American Company authorizing the agreement as to the use of its wires, and such action was subsequently ratified by an irregular and invalid resolution of the directors, but no member of the corporation has ever attempted to disaffirm the agreement, the defendant could not question its validity as a corporate act.

Appeal from a judgment entered on the verdict, and from an order denying a motion made upon the minutes for a new trial.

*Rush Taggart*, for appellant.

*Robert G. Ingersoll*, for respondent.

DANIELS J.—The verdict was recovered for damages sustained, and also by way of punishment for the act of the defendant in cutting wires, within this state, used by the plaintiff as receiver of the Bankers and Merchants' Telegraph Company in carrying on the business of telegraphing. The plaintiff, together with James B. Butler, were appointed receivers of the company in an action brought by the Farmers' Loan and Trust Company, as trustee, for the foreclosure of a mortgage executed to it to secure the payment of bonds amounting to the sum of $10,000,000, together with the interest accruing thereon. The mortgagors in the mortgage, consisted of the Bankers and Merchants' Telegraph Company, in this state, of a like company in the state of

New Jersey, another company in the state of Pennsylvania, and the Bankers' and Merchants' Telegraph Company of the city of Baltimore.

The mortgage was executed by the several mortgagors on or before the 27th of November, 1883. And by its terms it conveyed and confirmed unto the trust company, its successors and assigns, all the corporate rights, privileges, properties and franchises, and all the appurtenances, materials, stores, merchandise, furniture and fixtures, and all the real estate and interest therein, and all the contracts, telegraph lines, cable poles, wires, instruments, tools, apparatus, offices, fixtures, licenses, patents, patent rights, leases, stocks of other companies, securities, claims and demands of every kind, nature and description, wherever the same might be, or howsoever situate, then held, owned, leased or possessed by either of the mortgagor companies, or in which either of them might have any interest, and situate within the states of New York, New Jersey, Pennsylvania, Maryland, the District of Columbia, or within any other state or territory of the United States, or which might be thereafter acquired by them, or either of them, in those states or territories, to have and to hold the same in trust for the persons and corporations, firms and partnerships, who should hold the bonds and interest coupons proposed to be secured, or any or either of them.

The mortgage further provided and covenanted that in case default should be made in the payment of any of the principal or interest secured, and should continue for six months, the mortgagors should, upon demand, forthwith surrender the actual possession of all the telegraph lines, equipment, property and appurtenances and the premises conveyed, or intended to be conveyed, together with all the records, books, papers and accounts of the mortgagors, to the mortgagee, to be used, operated and managed, by the mortgagee, which from time to time should make the needful repairs and alterations, additions and improvements

therein as to the mortgagee should seem to be wise, and receive the tolls, rents, incomes, issues and profits thereof, out of which it was at liberty to pay all proper costs, charges and expenses of taking, holding and managing the property. An unqualified right of entry was also given to the mortgagee in case of such default, with liberty to take possession of the property mortgaged and make sale of it at public auction at the Merchants' Exchange salesroom in the city of New York, after giving specified notice for six months, mentioned in the mortgage. It was also further covenanted and agreed that upon the filing of a bill in equity, or the commencement of other judicial proceedings to enforce the rights of the mortgagee and of the bondholders, the mortgagee should be entitled to the appointment of a receiver or receivers of the property mortgaged, and of the earnings, income, rents, issues and profits thereof, pending such proceedings, with such powers as the court making the appointment should confer.

Default was made in the payment of the moneys secured by this mortgage, and on the 22d of July, 1885, an action was commenced by the trustee company for its foreclosure and a sale of the mortgaged property. And it was in that action, and under the authority specially conferred by the mortgage, that the order was made by this court appointing the two receivers, already mentioned, to take charge of the property mortgaged so far as it was situated within this state. These receivers were invested with power to carry on, and conduct, the business of the defendant under the direction of this court. And for that purpose the possession of the property encumbered by the mortgage was secured to them. On the 29th of May, 1885, Mr. Butler, one of the receivers, resigned his office and was discharged therefrom, leaving the plaintiff to exercise the functions and authority conferred and created by the preceding order.

He took possession of the property mentioned in the

mortgage, including certain wires which had, after its execution, been strung by the Bankers' and Merchants' Telegraph Company upon the poles of the American Rapid Telegraph Company; and he continued in the possession and use of those wires, and of premises occupied by him for the carrying on of this business by means of the wires, at 187 Broadway and 5 Dey street, in the city of New York. To these premises neither the American Rapid Telegraph Company, nor the defendant in this action, had any right or title whatever. But on the 10th day of July, 1885, persons in the employment and acting under the direction of the defendant, a corporation existing under the laws of this state, went upon the roof of the buildings and cut the wires, which in this manner were used and employed by the plaintiff as receiver, under the orders and authority already mentioned. That severed the working apparatus of the office from the wires and disabled the plaintiff, together with the persons who were employed by him for that object, to carry on the business of the telegraph company, as that had been directed and authorized by the orders.

The wires severed in this manner remained detached until the thirty-first of the same month, when the property was sold under a judgment of foreclosure obtained in the action of the Farmers' Loan and Trust Company against the several corporations which had executed the mortgage; and it was for this injury and disturbance of the plaintiff's possession, and the disability in this manner created for carrying on the business mentioned in the orders, that this action was brought against the defendant. And irrespective of the question of title, unless that shall appear to have been out of the Bankers' and Merchants' Telegraph Company, and not encumbered by this mortgage, and was vested in the party under which the defendant claimed to derive the right to cut these wires, it would, under these circumstances, be liable to respond to the plaintiff for the damages sustained by him by reason of this invasion of his rights

and trespass upon his possession.   For as against a wrong-
doer whoes act is not authorized or connected with an out-
standing title, possession of the property itself by the
plaintiff in this manner is sufficient to entitle him to main-
tain an action for the recovery of. the damages sustained by
him by reason of the trespass.   Jackson *v.* Hazen (2 Johns.
21); Jackson *v.* Harder (4 Id. 202); Palmer *v.* Aldridge
(16 Barb. 131); Day *v.* Alverson (9 Wend. 223); Whitney
*v.* Wright (15 Id. 172); Althause *v.* Price (4 E. D. Smith,
347); Hoyt *v.* Gelston (13 Johns, 151); Inhabitants, etc., *v.*
Thacher (3 Met. 239); Stowell *v.* Otis (71 N. Y. 36);
Wheeler *v.* Lawson (103 Id. 40; 2 N. Y. State Rep. 791.)

When the plaintiff was entitled to recover under this
state of the evidence, if his action was not answered by
other testimony and proceedings, were the damages sus-
tained by him by this disturbance and interruption of his
possession, and by reason of this consequent inability to
proceed with the transaction of the business committed to
his charge.   And to that if the conduct of the defendant
was wanton, wilful or malicious, suitable damages, in their
discretion, could be added by the jury by way of punish-
ing this misconduct on the part of the defendant.

But one of the defenses presented by the answer, and to
sustain which proof was given at the trial, was, that the
Bankers' and Merchants' Telegraph Company had no right,
title or authority to place the wires, which had been in this
manner severed by the defendant, upon the poles of the
American Rapid Telegraph Company.   And that the de-
fendant sustained such a relation to that company, and the
receiver appointed to take charge of affairs, as justified it in
cutting and severing these wires.   To sustain this de-
fense, it was proved that seven different corporations
known as the American Rapid Telegraph Company, in dif-
ferent states and in the city of Baltimore, did, on or about
the 15th of September, in the year 1883, execute and deliver
a mortgage upon their property to the Boston Safe Deposit

and Trust Company, a corporation existing under the laws of Massachusetts, to secure the payment of $3,000,000 in bonds issued under the authority of the mortgagors. This mortgage, in its general provisions, was quite similar to the mortgages executed by the Bankers' and Merchants' Telegraph Company to the Farmers' Loan and Trust Company to secure the $10,000,000 in bonds. It provided in substantially the same language for the conveyance, confirmation, assignment and transfer of the corporate rights of the mortgagors, with their appúrtenances, material, stores, furniture, fixtures, real estate and interest therein, and their and each of their contracts, telegraph lines, cables, poles, wires, instruments, tools, apparatus, offices, fixtures, licenses, patents, rights, leases, stocks of other companies, securities, claims and demands of every kind, held, owned, leased or possessed by the mortgagors, or either of them, or in which they, or either of them, had or might have an interest, or which might be thereafter acquired by them, or either of them, for the security of these bonds.

And it was further provided, in like manner, that the mortgage should include the lines intended to be constucted or acquired by the mortgagors connecting Buffalo and New York by a northern route with Chicago, in Illinois, Pittsburg, in Pennsylvania, by Columbus, Ohio, Indianapolis and Terre Haute, Indiana, with St. Louis, in the state of Missouri, Columbus, Ohio, with Cincinnati, Ohio, and Louisville, Kentucky, and Terre Haute, in Indiana, with Chicago, " together with all the materials, supplies, batteries, instruments and electrical machinery, or appliances, machinery, office furniture, equipment or appurtenances, of every kind and nature, which was then owned, or which might thereafter be constructed, or acquired, for its use, in connection with the above described lines of property, or either of them."

This mortgage also, without in any manner enlarging the description of the property mortgaged, provided that

the safe deposit company, as trustee, should be at liberty, after six months' default in the payment of any principal or interest secured by the mortgage, to enter into and take possession of the mortgaged property, and also for the sale of it in like manner as the same authority was provided for in the mortgage of the Bankers' and Merchants' Company to the Farmers' Loan and Trust Company, and for the appointment in any judicial proceeding, or the filing of a bill in equity to enforce the rights of the trustee and of the bondholders under the mortgage of a receiver or receivers " of the property hereby mortgaged, and of the earnings, income, rents, issues and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer."

Default was made in the payment of the debt in this manner, secured by this mortgage, and on the 16th of March, 1885, an action was commenced in the circuit court of the United States, for the district of Connecticut, in the second circuit, to foreclose this mortgage. And in that action, at a court held in the city of Hartford, an order was made appointing Edward Harland receiver of all the property covered by and included in the mortgage, or deed of trust, mentioned and specified in said bill of complaint herein, with the usual powers of receivers in such cases.

He was then directed to take possession of the records, certificate books, order books, contracts, accounts, statements, correspondence, and other papers of the American Rapid Telegraph Company and of all evidence of indebtedness, or of title to real or personal property belonging to the defendant, and of all property " of every name, nature and description whatsoever included or covered by the description contained in said mortgage, or deed of trust, which belonged to the said defendant, the American Rapid Telegraph Company, at the date of the execution of said mortgage, or deed of trust, and all that has been erected or constructed by said defendants, or paid for by them, or either

of them, since said debt." And in case he should find that there was further property which the defendant was legally or equitably entitled to have, thereupon likewise to take possession of the same, and every part thereof, not in the possession of some other person or corporation claiming the right of possession or title thereto. But in that case that he should take suitable and proper proceedings to obtain possession thereof, or of the part as to which the claim should be made, and the determination of the title to the same, as he might be advised. And he was empowered and authorized to manage, conduct and carry on the business of the defendant company, so far as the possession which he might acquire of its lines and property should, from time to time, enable him so to do, in such manner as he might judge to be most expedient to promote the earning power of the property. On the 19th of May, 1885, a like order was made on the bill of complaint in the circuit court of the United States for the southern district of New York. And under these orders he qualified as receiver, and entered upon the discharge of his duties, and the exercise of the authority conferred upon him.

After this appointment, and on the 2d of June, 1885, this receiver commenced an action in the circuit court of the United States for the southern district of New York, against the Bankers' and Merchants' Telegraph Company, and the plaintiff, as receiver in this state, and other persons as receivers of its property in other states, to obtain possession of the property of the mortgagors situated in those states.

This bill was obviously filed under the authority contained in the orders appointing the plaintiff in it as receiver, allowing him to take suitable and proper proceedings to obtain possession of so much of the property or of the part thereof, as should be in the possession of and claimed by any other person or corporation. The order by its language apparently intended to sanction legal proceedings to be

brought by the receiver to recover telegraphic property in the possession of any other person or corporation than the mortgagors, which should prove to belong to the mortgagors, and to be for that reason subject to the lien of the mortgage. It was not contemplated by the use of this language that a disorderly and forcible proceeding should be resorted to under the authority of the order for dispossessing any other person or corporation which should be in the possession of property claimed by the receiver to belong to these mortgagors. But what was evidently designed by the order was, that such legal proceedings might be taken and prosecuted by him as would secure a determination of the right or title to disputed property, which might be found in the possession of some other person or another corporation.

To forcibly interfere and disturb what appeared to be the quiet, peaceable and legal possession of another party was no part of this direction contained in the order. And it seems to have been so understood from the allegations contained in this bill of complaint of the receiver against the Bankers' and Merchants' Telegraph Company and the plaintiff in this action.

A primary and paramount purpose of this action of the receiver appears to have been to acquire the possession of the sections of telegraph lines mentioned in the mortgage to the Boston Safe Deposit and Trust Company, and still being in the possession of the Bankers' and Merchants' Telegraph Company, or its receiver. These were the lines the mortgage referred to as being intended to be shortly constructed and acquired for the mortgagors, connecting the points mentioned in the mortgage. And by this language it was obviously intended to refer to the additional sections which the Bankers' and Merchants' Telegraph Company had agreed to erect and provide by the contract made with the Rapid Telegraph Company, on the 28th of August, 1883. For the points to be in this manner connected by

the new sections are the same as those mentioned in the mortgage afterwards given by the Rapid Telegraph Companies to the Boston Safe Deposit and Trust Company.

And for the erection and connection of these sections with the existing lines of the Rapid Telegraph Companies, it was agreed that the bonds secured by the mortgage to the Boston Safe Deposit and Trust Company, amounting to the sum of $3,000,000, should be delivered over to the Bankers' and Merchants' Telegraph Company. And they were afterwards so delivered and finally exchanged under another agreement for a majority of the stock of the Rapid Telegraph Companies.

In addition to the sections in this manner to be erected and connected, the Bankers' and Merchants' Telegraph Company appears to have erected other sections of telegraph lines for the restoration of dilapidated sections of the American Rapid Telegraph Company, and to straighten the lines previously occupied or used by that company. And it was the object of the bill also to secure the delivery of these sections to the receiver appointed in the foreclosure action of the Boston Safe Deposit and Trust Company. And in addition to that, without either elaborating or clearly extending, the claim of the receiver, a claim rather incidental than directly, was asserted in the bill of the right to the wires now in controversy, which had been strung by the Bankers' and Merchants' Telegraph Company upon the poles of the American Rapid Telegraph Company. By this bill the receiver claimed to be entitled to recover the possession of these wires. And this generally was a proceeding which was undoubtedly within the authority of the orders appointing the receiver, both in the state of Connecticut and in the state of New York. And as to the title to these wires, if this had been the action first commenced, bringing the title into controversy, it would, without doubt, secure priority to the receiver to have this subject adjudicated and determined in his action, in which the plaintiff

himself was made a defendant.  For where an action has been properly commenced in one of the federal courts to determine the right or title to property, the jurisdiction of that court, undoubtedly, becomes from that time exclusive, and it cannot be affected by an action afterwards brought or commenced in a court of one of the states.

This subject was very fully examined and considered in Freeman *v.* Howe (24 How. U. S. 450), where, upon an examination of the preceding authorities and the principles applicable to the controversy, this exclusive jurisdiction of the federal courts over a controversy brought before it by suit was sustained.  The same subject was further considered again in Heidritter *v.* Elizabeth Oil Cloth Co. (112 U. S. 294), and this principle of exclusive jurisdiction reasserted and maintained ; but it does not aid or assist the defendant in this action.  For the bill of foreclosure of the Boston Safe Deposit and Trust Company, no claim whatever to the wires now in controversy was made on behalf of the plaintiff.  On the contrary, that suit was instituted to enforce the mortgage against the property mentioned and described in it, " which was then owned, or which might thereafter be constructed or acquired for its use in connection with the above described lines of property, or either of them."  These controverted wires did not fall within the description of property covered by the mortgage or included in this bill of complaint, but they were by clear implications excluded from it, for they were not the property of the American Rapid Telegraph Company when the mortgage was executed.

Neither were they afterwards placed upon its telegraph poles by it, or acquired by it for its use, but they were placed there by the Bankers' and Merchants' Telegraph Company for its own use and enjoyment.  And that these wires were not used within the comprehension of that suit, is further evident from the prayer of the bill itself, which was that the defendant, being the American Rapid Tele-

graph Company, should " be barred and foreclosed forever of, and from all right, title and equity of redemption of, in and to the said mortgaged premises, and every part thereof, and may . deliver the possession thereof, and all deeds, evidence and muniments of title relating to, and concerning the same unto your orator, and that the said mortgaged premises, with the appurtenances, may be sold," etc., and that " pending this suit a receiver may be appointed according to law of all the property covered by and included in said mortgage or deed of trust, with the usual powers of receivers in such cases."

And it was no part of this bill of complaint to assert title to the wires now in controversy. But it was limited in its charging part, as well as in its prayer for relief, to the property described and referred to in the mortgage. And that was such property as the Rapid Telegraph Companies then owned, or which might be thereafter acquired by those companies, or either of them, together with the lines of telegraph already mentioned to be constructed under the contract of August 28, 1883. This bill of complaint, therefore, did not bring the title to these wires in any respect in subordination to the foreclosure suit commenced by it. But that was for the first time done in the complaint of the Farmers' Loan and Trust Company to foreclose the mortgage executed and delivered to it by the several corporations known as the Bankers' and Merchants' Telegraph Companies. By the mortgage executed and delivered to that company, the wires owned by the mortgagors, or which might be thereafter acquired by them in either of the states of New York, New Jersey, Pennsylvania, Maryland or the District of Columbia, or within any other state or territory of the United States, was brought within and subject to the security of this mortgage. And these particular wires consequently became a part of the property which, by the foreclosure action, as that has been described, it was finally required should be sold for the purpose of

making payment of the debt secured by the mortgage. This suit was commenced on or about the 22d of April, 1885, and subordinated the right and title to these particular wires to the jurisdiction of this court, for the reason already mentioned, that they were brought within the allegations and scope of the complaint itself, and were not in any manner within the range or comprehension of the bill of complaint previously filed by the Boston Safe Deposit and Trust Company. And that, under the principle maintained by the authorities already referred to, gave this court the exclusive power and authority to determine the title and disposition which should be made of these wires.

And it was not divested of this power and authority by the action of the receiver in the United States courts, which was made to include these particular wires, for that was not commenced until the 2d of June, 1885. So far, therefore, from there being exclusive jurisdiction in the federal courts over this subject, the fact was entirely the contrary. The jurisdiction was first acquired over the title to these wires by the foreclosure action of the Farmers' Loan and Trust Company. This exclusive jurisdiction of this court, however, forms no defense to this action, for it has not been presented as such by the answer of the defendant. Neither could it have been, for the foreclosure suit in this court terminated in a judgment on the 5th of June, 1885, upwards of two months prior to the commission of the trespass forming the subject of this action. That trespass was also entirely distinct from all matters connected with the foreclosure, and constituted an independent cause of action against the defendant in and of itself. And leave to prosecute for the recovery of the damages sustained by the receiver was given to him by an order of this court made on the 29th of August, 1885. And the principle of exclusive jurisdiction, under the doctrine of the authorities already mentioned, could not be infringed or disturbed, in any manner by the subsequent action of the receiver appointed in the foreclos-

sure suit brought in the United States circuit court in the state of Connecticut. For that reason it was competent for this court upon the trial of this action to inquire into and investigate the title of the Bankers' and Merchants' Telegraph Company, and of the right of the Farmers' Loan and Trust Company, under the mortgage delivered to it, to these wires. And accordingly proof on that subject was received on the trial.

To support the title of the Bankers' and Merchants' Telegraph Company to the wires, and the right of the Farmers' Loan and Trust Company to subordinate them to, and sell them under its foreclosure action, an agreement was produced and read in evidence made on the 18th of October, 1883, between the Bankers' and Merchants' Telegraph Company, and the American Rapid Telegraph Company. By this agreement the right was declared to be secured to either of the parties to it, to string their wires upon any of the telegraph poles owned by either of the other companies, and to use, maintain and operate such wires in the conduct of its business. For this privilege the company in this manner, using the poles of the other company, agreed to pay a yearly rent of four dollars a mile semi-annually. And if the rent should not be paid, then it was agreed, not that the wires so strung should become the property of the company entitled to the rent, but that it might direct the other to remove those wires from its poles.

But if that was not done within six months after notice, then it was agreed that the wires should become the property of the company upon whose poles they were placed. It was further, also, provided that either party, after the expiration of ten years from the date of the contract, might terminate the right of the other to use its poles, as described in this manner, upon six months' previous written notice to the other, and if, after the expiration of the six months, their cross-arms, etc., should not be removed, the company owning the poles should have the right to remove them at

the expense of the other party, or at its option to acquire and own the same, after paying therefor $200 per mile per wire. Under this contract these disputed wires were placed upon the poles of the American Rapid Telegraph Company, and it has been affirmed, in behalf of the present defendant, that placing them in this manner upon the poles of that company, and after the mortgage was made to the Boston Safe Deposit and Trust Company, they became fixtures and subject to that mortgage. Ordinarily, and where wires are placed in this manner upon telegraph poles, they do, under the law, as it has been declared in this state, become fixtures and a part of the realty. American Union Tel. Co. *v.* Middleton, 80 N. Y. 408.

But, however the mortgage executed to the Boston company may be regarded in other states, under the law of this state, and it was under that law that the American Rapid Telegraph Company of this state executed it, the mortgage was no more than a lien upon the property described in it. Trustees, etc., *v.* Wheeler, 61 N. Y. 88, 118, and cases there cited.

The estate in the land, notwithstanding the mortgage executed and delivered in this manner, still remained in the mortgagors. So much of the mortgaged estate as was situated in this state remained the property of the American Rapid Telegraph Company, subject only to the lien of the mortgage, and it was still within the power and authority of the Rapid Telegraph Company to enter into this contract for the use of its telegraph poles in this manner, by the Bankers' and Merchants' Telegraph Company, subject to that use being ended and determined by a foreclosure and sale of the property of the Rapid Telegraph Company under that mortgage.

This was considered quite at large in Tifft *v.* Horton (53 N. Y. 377), where an agreement of this description was maintained and enforced by the court, and substantially the same rule was followed in the disposition of the case of the

United States *v.* New Orleans Railroad (12 . Wall. 362). It is true that this was considered to be subject to a different rule, where the articles affected by the agreement might become a permanent part of the structure, but that in no manner determines or affects this case, for the reason that the wires strung upon the poles of the Rapid Telegraph Company were not made an essential portion of any part of the structure of that company.

This qualification was further declared and followed in Porter *v.* Pittsburg Steel Co. (122 U. S. 267, 283). And it was also considered in New York, etc., Western Railway Co. *v.* Weston Union Telegraph Co. (36 Hun, 205). But there the wires were held to become affixed to the real estate, for the reason that they were placed upon the poles under an agreement by which they were finally to become the property of the telegraph company claiming them. But for the reason that these wires were loose and detachable articles, without in any manner affecting or impairing the substantial structure of the American Rapid Telegraph Company, and were intended to remain the property of the company placing them on the poles, this principle is inapplicable to this case. And no question arises here concerning the rights of *bona fide* bondholders secured by the mortgage to the Boston Safe Deposit and Trust Company, for all those bonds, pursuant to the agreement of the 28th of August, 1883, were delivered in fulfillment of the terms of that agreement to the Bankers' and Merchants' Telegraph Company. And by that company, under a further agreement made on the 29th of January, 1883, they were delivered over to the other party in that agreement to be exchanged for the stock of the American Rapid Telegraph Company. No superior or conflicting equities, therefore, stand in the way of the disposition of this case. And these wires having been placed upon the poles of the Rapid Telegraph Company under this agreement, and with the apparent and well defined intention that they should not thereby become a

part of the real estate, but should retain their character as personal property, that intention is required to be preserved and maintained by the court. And the agreement is evidence of the existence and observance of that intention, whether it has been made in such a manner as to be strictly and legally binding upon the American Telegraph Company or not.

It has been insisted that it did not become binding upon that company, for the reason that it was authorized by two members of an executive committee of the American Rapid Telegraph Company of Connecticut, without the concurrence or knowledge of the third member. And the evidence tended to establish the fact that this was the manner in which the agreement was made and executed. But it appears to have been subscribed and authenticated by the act of the president of the Bankers' and Merchants' Telegraph Company, as well as by its secretary and seal, and by the American Rapid Telegraph Company by its general manager, authenticated by him, and sealed with the seal of his company, and by a meeting of the directors of the American Rapid Telegraph Company of Connecticut, held on the 14th of August, 1884, a resolution was adopted ratifying this contract and all acts done thereunder. This resolution, as well as the agreement itself, has been objected to as having been adopted irregularly and without authority, for the reason that no notice in the call for the meeting was given that this subject would be considered by it.

In that respect, as well as in the circumstance that by the acquisition of a larger part of the stock of the American Rapid Telegraph Company by the Bankers' and Merchants' Telegraph Company, through which the latter had substituted its own directors for those of the other company, both proceedings were probably irregular. But even if they were, that will not permit this receiver, or the defendant acting under a contract with him, to disaffirm this contract of October 18, 1883, for it was made concern-

ing no part of the property included in the mortgage to the Boston Safe Deposit and Trust Company. It affected only and solely the rights of the mortgagors, the American Rapid Telegraph Company. That company or its stockholders, either the majority or the minority, might have disaffirmed this agreement as well as this ratification of it. But they all failed to take any proceedings, or present any objection to bring about such a result. It may fairly be presumed that the contract, as well as the acts of the Bankers' and Merchants' Telegraph Company under it, came to the knowledge of the stockholders of the American Rapid Telegraph Company during the long interval existing between the making of this agreement and the filing of the receiver's bills in June, 1885. And from this failure to act, it may reasonably be inferred that the contract, though irregularly made and ratified, was still satisfactory to the American Rapid Telegraph Company, as well as its stockholders. And as what was done under the agreement in no manner infringed the rights or affected the security of the Boston Safe Deposit and Trust Company under the mortgage, neither that company, nor this receiver, has yet been placed in a condition where it could disaffirm or set aside this agreement.

A further objection has been made that the agreement had no effect over the poles of the American Rapid Telegraph Company, situated within the state of New York, for the reason that it was made and in this manner ratified under the authority of the American Rapid Telegraph Company, in the state of Connecticut. But by the agreement itself it was in no respect restricted to the telegraph poles erected in that state, but the agreement was made in such general terms as to include all the poles of the American Rapid Telegraph Company. And the Connecticut company is shown to have owned the larger part of the stock of the companies in the other states, and to have practically been in the management of their affairs. And the agreement it-

self was subscribed on behalf of the American Rapid Telegraph Company by its general manager. It is true that this ownership of the stock of the other companies by the Connecticut company would not of itself entitle it to enter into this agreement and make it binding upon the company incorporated under the laws of this state. The principle excluding this result was settled in Pullman's Palace Car Co. *v.* Missouri Pacific Railroad Co. (115 U. S. 587). But the power to enter into this contract does not stand upon the fact that the Connecticut company had in this manner acquired the stock of the other companies, but upon the fact that the management of the affairs of the other companies appears to have been committed to the Connecticut company.

And that this was the fact is conceded by the bill of complaint filed by the Boston Safe Deposit and Trust Company for the foreclosure of its mortgage. It has, for this purpose, alleged " that prior to the 28th of August, in the year 1883, the defendant, the American Rapid Telegraph Company of Connecticut, had become the owner of substantially the whole of the capital stock of each and every of the above named six corporations, and that through such ownership the control and management of said other above-named six corporations, and their properties, was vested in and controlled by the said American Rapid Telegraph Company of Connecticut, and that the telegraph systems owned by the said six several companies above named, were, together with the property of said defendant, operated by the defendant, the American Rapid Telegraph Company of Connecticut, as one continuous line or system of telegraph between the points reached by the said telegraph lines of the said several corporations." This assertion, broad and unqualified as it is, and being further supported by evidence on the trial, was sufficient to prove the fact that the Connecticut company had the power to enter into this agreement with the Bankers' and Merchants' Telegraph Company for the use, in this manner,

4

of the wires of the American Rapid Telegraph Company, over the entire lines occupied and used by those companies. And having that power, it possessed the authority through its general manager, even though that might have been irregularly performed, of making and entering into the agreement of the 18th of October, 1883. And under the authority applicable to that agreement, and what has been done by way of carrying it into effect, the wires placed upon the poles of the American Rapid Telegraph Company still remained, notwithstanding the fact that they were so placed there, the property of the Bankers' and Merchants' Telegraph Company, to the possession of which, under the bill of complaint of the Farmers' Loan and Trust Company, the plaintiff, as receiver, succeeded and became entitled. And as no judgment for the sale of the lines of the American Rapid Telegraph Company had been entered, and no sale had been made at the time when the defendant cut these wires, neither the receiver in the Boston Safe Deposit and Trust Company's suit, nor the defendant, had any right to interfere with the possession of the plaintiff.

The order made in this court on the petition of the defendant after the execution of the contract with it by that receiver, on the 10th of July, 1885, did direct the plaintiff to surrender and turn over to the defendant, as the agent of the receiver, all the property of the American Rapid Telegraph Company and the several auxiliary companies particularly described in folios 27 to 49 inclusive of the bill of complaint of the receiver appointed in the suit of the Boston Safe Deposit and Trust Company, and permitted the defendant to take possession of that property and enjoy and operate the same under and pursuant to the terms of the contract mentioned in the petition which was no other than the contract of the 28th of August, 1883, which contained no reference to these wires in any shape or manner whatever.

This order was made without notice to the Farmers' Loan and Trust Company, the plaintiff in the foreclosure

action instituted upon the mortgage given to that company, and without notice to any other person or party interested in, or connected in any manner with the litigation. In this respect it was clearly irregular, if not entirely without authority, and it was afterwards so considered and regarded. For the court by which it was made, on the same day, and after these wires had been cut under the authority of the defendant, made an order requiring it to show cause on the fourteenth of the same month why the order of the tenth of July should not be vacated for the reasons mentioned in the petition, and also upon the ground of its irregularity. This application was not heard by the court on the 14th but on the 16th of July, 1885, by an order of the circuit court of the United States, held in Connecticut. Its receiver was directed to restore and return or cause to be restored and returned, each and every pole and wire mentioned in the application for it, which belonged to, or had been strung by the Bankers' and Merchants' Telegraph Company, if any of such wires or poles were in the custody or possession, or under the control of its receiver. On the next day after this order was made, a stipulation was entered into between the attorneys for the parties, agreeing that the Bankers' and Merchants' Telegraph Company and the plaintiff in this action should deliver to the receiver in the action in the United States court the possession of any and, all poles or wires that might have been erected, constructed, or strung under and by virtue of the agreement of the 28th of August, 1883, but of which these wires form no part. And this was afterwards, by an order of the same circuit on the twenty-third of July, limited in terms to the four wires which it was agreed, by the contract of the 28th of July, 1883, should be placed upon the sections of the lines to be constructed under that contract by the Bankers' and Merchants' Telegraph Company for the American Rapid Telegraph Company, and as to the residue of the wires and poles, it was declared that they should remain until

further order in the possession of the receiver, or receivers, of the Bankers' and Merchants' Telegraph Company as at present; and a similar disposition was sanctioned by the order of this court made on the 18th of July, 1885, on the hearing of the order to show cause made on the tenth day of the same month. These proceedings, therefore, entirely vacated the *ex parte* order of the tenth of July, so far as that order conferred any authority upon the defendant to interfere with the wires in controversy in this suit; and by that change in this order it ceased to be operative in favor of the receiver in the United States court or of this defendant, and afforded no sanction to the acts of the latter in cutting these wires. For where an irregular order has been vacated, it is held to be the same as though it never existed, and for that reason to afford no protection to the acts which may have been performed under it. Chapman *v.* Dyett, 11 Wend. 31 ; Deyo *v.* Van Valkenburgh, 5 Hill, 242 ; Simpson *v.* Hornbeck, 3 Lans. 53.

The objection that the contract, if it is to rest in parol, for stringing and using these wires, was within the statute of frauds, appears to be without any substantial support. If it is to be held to be a mere license for consideration to be paid, to place the wires of the Bankers' and Merchants' Telegraph Company upon the poles of the other company, then this statute has nothing whatever to do with the agreement. Du Bois *v.* Kelly, 10 Barb. 496.

But even as an executory oral agreement, if it should be held to be within the statute as far as it has been performed by the act of one of the parties, with the acquiescence of the other, the statute will not interfere to annul the validity of that performance, or to sanction this trespass. Hess *v.* Fox, 10 Wend. 437, 440–442; Bishop on Contracts, section 634, and cases referred to in note. Abbott *v.* Draper, 4 Denio, 51, 53–54.

The further objection that the contract was unauthorized because of the omission to obtain the sanction of three-

fifths in interest of the stockholders of the American Rapid Telegraph Company, under chapter 568 of the Laws of 1870, is likewise unsupported. For the contract involved no lease, sale, or conveyance, of the property of the American Rapid Telegraph Company, or of any of its rights, privileges, or franchises, or any interest therein. But all the rights, privileges, and franchises which were owned or possessed by the American Rapid Telegraph Company, remained just as much and as completely its property, and under its dominion, as they did before this agreement of the eighteenth of October was made. It provided for no more than a privilege or easement, to be enjoyed by the Bankers' and Merchants' Telegraph Company, without in any manner abridging or limiting any of the rights, privileges, or franchises, of the other company. And for that reason the agreement did not require the sanction or approval of these stockholders. And if it did, the omission to obtain it would not be available to this defendant, as the act was that it did not act under any authority from this Rapid Telegraph Company.

The objection that this action is substantially against the receiver appointed in the foreclosure proceeding in the United States court, is without foundation. If it were, it would follow that the suit could not be maintained without the leave of that court. Wiswall *v.* Sampson, 14 How. U. S. 52; Barton *v.* Barbour, 104 U. S. 126.

It is, however, in no sense an action against the receiver or against any party to the suit brought and prosecuted in his behalf; but it is against the defendant for a separate, distinct and independent wrong, committed by it on the possession of the plaintiff, by cutting these wires. That was not authorized by the agreement which the receiver made with the defendant, although it might, as a matter of fact, have been contemplated that such an act of trespass would be performed under claim of its authority. But against any possible liability for the act, the receiver took

care to guard himself by the agreement in securing an undertaking, or obligation, from the defendant to save him harmless, and from and against all and any manner of liability, loss, damages, or penalty whatsoever which might arise or accrue upon, or by reason of any act or thing which the defendant might do, or cause or permit to be done, under or by virtue of any of the terms, covenants or agreements contained in the contract. It was designated as an agency, but, in fact, the contract was a lease to the defendant of the telegraphic lines of the American Rapid Telegraph Company, for which it agreed to pay to the receiver of that company a stipulated rental. What the defendant did in cutting these wires, accordingly, was its own act, its own wrong, and a suit brought against the defendant for indemnity is, in no respect whatever, either directly or indirectly, an action against this receiver.

Neither is the pendency of the suit brought by the receiver, involving, as it does, the title to these wires, a defense to this action, for in that suit the plaintiff could not obtain the redress or indemnity which it is the object of this action to secure. It would exclusively include the disputed controversy as to the title to these wires, if that subject had not been brought within the comprehension of the action previously instituted by the Farmers' Loan and Trust Company. But even that would not prevent the plaintiff, as the person whose possession had been disturbed and interrupted by the act of the defendant, from prosecuting this action to a successful result against the defendant, for a preceding action will not be a defense to a succeeding suit when the preceding action is of such a description as will not include the relief it is the object of the succeeding suit to secure. Haire *v.* Baker, 1 Seld. 357.

Besides that, the defendant is not a party to the receiver's action, and cannot be made to respond in that suit for that reason for the damages which the plaintiff has sustained by this unlawful act.

Neither is it a defense to this action that the purchaser under the foreclosure sale, in the suit of the Farmers' Loan and Trust Company, might maintain an action to recover the same damages. As to that right, it is not clear that it exists when the action, as this has been, is for the interruption of the use of the property.

In Laflin *v.* Griffiths (35 Barb. 58), the cause of action was for an injury to the property itself, and the purchaser of the mortgaged property was allowed to maintain the action, for the reason that at the time when the waste was committed he had at least a conditional title, or a lien upon the property, through the foreclosure, ripened into an absolute title. But even if under the sanction of this authority the purchaser at the foreclosure sale could maintain an action because of this wrongful act of the defendant, it by no means follows that the receiver himself would be disabled from bringing and sustaining this suit, which was for the injury to and interruption of his possession. This wrong has been done directly to him as the possessor of this property. And under the authorities which have been referred to, a right of action for that vested in him. And he, having brought the suit before any action has been instituted by the purchaser, is in a condition to prosecute it to a successful completion, if he shall be otherwise able so to do. In neither of the objections which have been taken to the plaintiff's right to maintain this action does the defendant appear to be entitled to support. They were presented in an exhausting variety of forms, which do not require to be specially noticed for the disposition of the action. For it is sufficient that the right of the plaintiff to maintain the action is supported by what has already, in this manner, been shown to have taken place. And that right cannot be defeated by exceptions which were taken to the charges, or to the refusal of the court to charge upon these various subjects.

But the case, as to the right of the plaintiff to damages,

stands upon a more infirm foundation.  As to that right he was permitted to prove, against the objections and exceptions of the defendant, the value of the Bankers' and Merchants' telegraph system.  The witness interrogated upon this subject, put the value at the sum of from three to four millions of dollars.  Upon a like objection the court allowed proof to be given of the amount for which the property was sold under the judgment in the Farmers' Loan and Trust Company's foreclosure suit, and that was stated to the sum of $500,000.  This evidence should not have been be received, for the value of the property itself supplied no criterion as to the amount the plaintiff was entitled to recover.  He was in no sense the owner of that property. What he was entitled to was its possession, use and employment in the telegraphic business.  And the injury sustained by him through the trespass of the defendant was the interruption and termination of that possession and use from the tenth to the thirty-first of July.  Whatever the damages were which resulted in this manner from the act of cutting the wires in this state, he was entitled to recover. That would include the value of their use, or the loss sustained by him in consequence of the interruption of that use, by this act of the defendant.

And to establish the extent of his loss in this respect the value of the system itself was not a fact which could be considered.  Neither was the price for which the property was bid off by the purchaser at the foreclosure sale any evidence that the property had been depreciated from the valuation mentioned by this witness, to the extent of the difference appearing between his valuation and the amount of the bid.  For the bid was made under an agreement that it should be for the benefit of the reorganization intended to be made by the persons interested in the bonds and certificates of the receiver.  And the deed upon the sale in the foreclosure suit was by the consent of the purchaser actually delivered for the perfection of the reorgan-

ization in compliance with this agreement and undertaking. But notwithstanding these facts the court left this evidence to the jury for them to consider upon the question of the amount of damages the plaintiff was entitled to recover. And to that an exception was taken on behalf of the defendant. The court was further requested to charge that the plaintiff has no right of action for any depreciation in the value of the property caused by the alleged trespass for which this suit is brought. That was refused, and to that the defendant excepted. The court was also requested to charge that the jury in estimating the damages were not to consider the suggestion of difference between the value of the property and the price brought therefor at the foreclosure sale. That was in like manner refused, and an exception taken to the refusal. These exceptions seem to have been well taken, and on this matter of damages to entitle the defendant to another trial of the action.

It further appeared that the business carried on by the plaintiff in the use of these wires had not been a financial success, or if it were, that the results in his favor were by no means important or substantial. The actual loss sustained by him, therefore, in consequence of this wrong on the part of the defendant was not an extended one. In the most liberal view of the evidence a few thousand dollars would be sufficient to remunerate him for all the actual damages he appeared to be entitled to recover. But in addition to these the court submitted the question to the jury as to whether the plaintiff was not entitled to exemplary damages on the ground that the conduct of the defendant had been willful and malicious. There may be doubt under the evidence given by the counsel whose advice was erroneously followed, and the evidence of the witness Eckert, under whose direction the wires were cut, whether the element of malice or willful misconduct existed in the case. But even if it did, the amount allowed by the jury, beyond the actual damages proved in favor of the plaintiff, was entirely out of

all reasonable proportion to what could be claimed by way of punishment on account of the willful or malicious conduct in the cutting of these wires. The verdict rendered by the jury was for the sum of $240,000, which was clearly not justified, either by the loss occasioned to the plaintiff by the trespass, which was the subject of the complaint, or by the damages which could be appropriately allowed by the jury by way of punishing the defendant for the performance of a willful act. It is probable that this large amount may in part have been made up by what the jury, under the charge of the court, considered to be a depreciation in the property itself as distinguished from the interruption of its use by the act complained of. In that manner the evidence admitted as to the value of the Bankers' and Merchants' Telegraph system, and of the amount for which the property was finally sold under the judgment, probably had a mischievous and injurious effect upon the result of the trial. The defendant may also have been prejudiced by the proof which was given, subject to the exceptions and objections of the defendant, as to the value and income of its own property. This was a matter entirely irrelevant to the controversy between these parties, and could have no other use in the consideration or disposition of the action than to prejudice the rights or legal expectations of the defendant. On this account, and because of this evidence, as well as that which has been previously referred to, this judgment cannot be sustained. The judgment and order, therefore, should be reversed, and a new trial ordered, with costs to the defendant to abide the event.

All concur.